UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELAINE PARNAGIAN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * Civil Action No. 14-cv-14254-IT |
| | * |
| METLIFE DISABILITY INSURANCE | * |
| COMPANY, *et al.*, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

September 29, 2017

TALWANI, D.J.

I.  Introduction

Plaintiff Elaine Parnagian brings this action requesting judicial review of Defendant Metlife Disability Insurance Company's ("MetLife") denial of long-term disability ("LTD") benefits under the Raytheon Company Disability Plan Income Policy ("Plan"). Complaint [#1]. Before the court are cross-motions for summary judgment. Defs.' Mot. J. on the R. [#58]; Pl.'s Cross Mot. J. on the R. [#63].

II.  Legal Framework and Standard of Review

The Plan is covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). "Among its panoply of remedial devices for plan participants, ERISA provides for suits to enforce rights conferred under the terms of an ERISA-regulated plan." Denmark v. Liberty Life Assur. Co. of Boston, 566 F.3d 1, 5 (1st Cir. 2009). The parties here agree that in such suits, "summary judgment is merely a mechanism for tendering the issue and no special inferences are to be drawn in favor of a plaintiff resisting in

summary judgment." Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003). Instead, this court "sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." [1] Leahy v. Raytheon Co., 315 F.3d 11, 17-18 (1st Cir. 2002).

The parties further agree that because the Plan grants MetLife—as the Plan's Claims Administrator—discretionary authority to construe the Plan and to make determinations as to benefit eligibilities, "a decision made under the plan will be upheld unless it was 'arbitrary, capricious, or an abuse of discretion.'" Niebauer v. Crane & Co., Inc., 783 F.3d 914, 923 (1st Cir. 2015) (quoting Cusson v. Liberty Life Assur. Co. of Boston, 592 F.3d 215, 224 (1st Cir. 2010). Under this "generous" standard, the court determines whether the plan administrator's decision based on the record before it was "reasoned and supported by substantial evidence." See Medina v. Metro. Life Ins. Co., 588 F.3d 41, 45 (1st Cir. 2009) (citing Stamp v. Metro. Life Ins. Co., 531 F.3d 84, 88 (1st Cir. 2008)). Evidence is substantial when it is "reasonably sufficient to support a conclusion." Ortega-Candelaria v. Johnson & Johnson, 755 F.3d 13, 20 (1st Cir. 2014) (citing Cusson, 592 F.3d at 230).

---

[1] The parties have submitted by hand two volumes constituting the "Agreed Record for Judicial Review," bates-stamped from MET-00001 to MET-01764. Additionally, the parties have submitted under seal a joint appendix, in which Plaintiff has included additional Plan guidelines—bates-stamped MET-01765-01767—produced by MetLife under a confidentiality agreement. While these three additional pages are not technically part of the agreed-upon record, Defendants concede they "might be relevant to MetLife's interpretation of the Plan at the time of its final determination," Defs.' Reply [#71] 6, and the parties jointly agreed "that either party may submit these documents as part of their respective arguments under separate cover and/or pursuant to the protocol set forth in the parties' Confidentiality Agreement," as Plaintiff has done. Joint Statement and Proposed Schedule [#54]. Thus the court will consider these additional papers as part of the record on review.

The "mere existence" of contradictory evidence does not render a plan administrator's decision arbitrary and capricious. "Indeed, when the medical evidence is sharply conflicted, the deference due to the plan administrator's determination may be especially great." Leahy, 315 F.3d at 19. Additionally, courts cannot require administrators automatically to accord special weight to the opinions of a claimant's treating physician; "nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003) (rejecting importation of the Social Security Administration's "treating physician rule" into the ERISA context).

Thus, the "single question" before this court is whether MetLife "exercised its discretion reasonably," or abusively. See Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan, 705 F.3d 58, 61 (1st Cir. 2013).

III.     Factual Background and Administrative Decisions

Plaintiff began working at Raytheon Company ("Raytheon") in Tewksbury, MA, as a Senior Electrical Engineer II around December 8, 2008. See MET-01068-01069; Am. Compl. [#4] ¶¶ 17-20 ["Am. Compl."]. In March 2010, Plaintiff began to experience a variety of symptoms including but not limited to headaches, fatigue, muscle and joint pain, and focus issues. See MET-00322-00323; MET-00752. For the next six months, Plaintiff was permitted to work from home. MET-01063-01064. On or about October 13, 2010, when Raytheon no longer permitted Plaintiff to work from home, she stopped working, and filed a claim for short-term disability ("STD") under Raytheon's STD benefit plan. Am. Compl. [#4] ¶ 23; Defs.' Statement Undisputed Facts ¶ 5 ["Defs.' St. Undisp. Facts"] [#60]. MetLife initially denied Plaintiff's STD claim and confirmed its denial on administrative appeal. MET-01097, 01098. After she had

exhausted the administrative review process, Plaintiff sued MetLife in this court on February 8, 2012, seeking to recover both LTD and STD benefits. Am. Compl. [#4] ¶ 34. In a settlement of that action, MetLife agreed to pay Plaintiff STD benefits, and to reconsider her LTD claim under the Plan for the period starting in December 2010. Am. Compl. [#4] ¶ 35.

As part of the reconsideration process, Ms. Parnagian submitted additional documentation of her illness to MetLife, including her claim file with the Social Security Administration ("SSA"). See MET-00414.[2] Plaintiff also submitted updated medical records from her primary care physician, Dr. \_\_\_\_ Silver, and from Dr. \_\_\_\_ LaCava, her "long standing treating doctor and a specialist in chemical sensitivity." Am. Compl. [#4] ¶ 22; see MET-01757 (MetLife's summary of documentation received in support of benefits application). In a letter to MetLife dated April 1, 2011, Dr. LaCava summarizes Plaintiff's relevant medical history, and his recommendations for treatment. See MET-00370-00372. He asserts that she "has a personal history of having been frequently sick from childhood and hypersensitive to various exposures" and that she suffers from severe "chemical sensitivities." MET-00370. He also describes a variety of lab tests and their results which, in his opinion, demonstrate physical reactions to a variety of chemicals. See MET-00371. He asserts that:

> [b]ecause Ms. Parnagian cannot drive to work, cannot work with anyone else, and cannot work in any building but very old, but clean buildings . . . without experiencing debilitating headaches, respiratory irritant effects, fatigue, and cognitive dysfunction . . . she is totally and permanently disabled from all gainful employment. The ubiquitous presence of the chemicals to which she reacts and her debilitating physical and neurological symptoms after such exposures would render her an unreliable employee in any capacity and therefore unemployable.

MET-00371-00372.

---

[2] On February 12, 2012, the SSA found that Plaintiff had been disabled since October 13, 2010. Id.

At this point in the claims process, MetLife enlisted two physicians to evaluate Plaintiff's medical records. MET-00864-00879; 00828-00834. Dr. Stefanos Kales, a Diplomat on the American Board of Preventive Medicine (specializing in Occupational Medicine), opines that "there is no objective evidence of any occupational or environmental disorder in the records provided for Ms. Parnagian." MET-00865. He concludes that Plaintiff's medical records do not support any work limitations. MET-00872.

Dr. Peter Sugarman, Board Certified in Adult Psychiatry, also reviewed Plaintiff's medical records and came to similar conclusions regarding her psychiatric functional capacity. See MET-00828-00834. After speaking with both Dr. LaCava and Dr. Silver, Dr. Sugarman opines that "[a] psychosomatic disorder or a factitious disorder is not . . . suggested." MET-00832. He specifically notes that Plaintiff has not "required" any mental health treatment since December 2010, and asserts that such "argues against a mental health impairment." MET-00833. He also opines that the "file does not contain explicit evidence of psychiatric symptoms that are more reliably associated with impairment, such as suicidal or homicidal ideation that requires risk management, extreme psychomotor retardation or agitation, extreme mood lability, [etc.] . . . ." Id. Dr. Sugarman ultimately concludes that Plaintiff's "file information does not support psychiatric functional limitations beyond December 2010. . . " MET-00831.

After reviewing these physicians' reports, MetLife denied Plaintiff's claim for LTD on August 12, 2013. See MET-00954-00959. In its denial letter to Plaintiff, MetLife states that:

> [a]fter our review of [the information provided], it is not clear how you were medically disabled from performing your regular job functions, and the medical documentation on file does not support a severity of impairment that would have precluded your ability to work from a psychiatric or physiological perspective beyond December 22, 2010.

MET-00958. MetLife concludes that "[b]ased on our review of the information contained in your file, MetLife has determined that you currently do not qualify for LTD benefits under the terms and conditions of the Plan." Id.

Plaintiff appealed MetLife's denial of benefits, and submitted additional documentation for MetLife to consider in re-evaluating her claim. MET-00960; MET-00970-0974. In his letter, Dr. LaCava echoes similar arguments from his previous reports, asserting that "[t]he case for Ms. Parnagian may seem similar to cases where objective signs are lacking, but Ms. Parnagian's condition is fraught with significant cognitive and physical disruption upon exposure to low levels of chemicals." MET-00973. He again concludes that Plaintiff should not return to work, "as it will pose a risk to her health and well being . . . ." MET-00974.

MetLife, in turn, enlisted two additional physician consultants to review Plaintiff's records in order to assess her functional capacity. Dr. Dana Mirkin, Board Certified in Occupational Medicine and Toxicology, questions the validity of Plaintiff's diagnosis of chemical sensitivity. MET-00983-01009. Regardless, Dr. Mirkin reviewed Plaintiff's medical history and reached the same conclusion as Drs. Sugarman and Kales that Plaintiff's "medical records do not support any work limitations." MET-01000.

Finally, Dr. Nicole Johnson ("Dr. Johnson"), who is certified in Adult General and Forensic Psychiatry, evaluated Plaintiff's medical records. In her report, she, like Dr. Sugarman, notes that "[a]lthough there is mention, throughout the record, of her suffering from cognitive impairment and mood symptoms, she has not received care from a psychiatrist to address her mental health issues," which suggests the absence of a "debilitating mental health issue[]." MET-01016. She concludes that Plaintiff's medical history does not support psychiatric functional limitations. Id.

After reviewing the additional information that Plaintiff provided, along with the reports of its physician consultants, MetLife upheld its denial of LTD benefits. MET-01756 (". . . we have determined that the denial of the claim of Long Term Disability under the Plan was proper, and, therefore, we must uphold the denial decision.").

This action followed.

IV. Discussion

The court begins by noting that Plaintiff's frustration with MetLife's denial of LTD benefits is understandable. Plaintiff's two treating physicians, Drs. LaCava and Silver, maintained throughout the claims process that she is totally disabled from working because of her chemical sensitivities. See MET-01043 (where Dr. Silver states that "both I and her specialist agreed that, as before, it would be unsafe for [Ms. Parnagian] to return to her workplace"). These two physicians spent ample time working with and evaluating Plaintiff, and express little doubt as to their conclusions. See MET-01043 (Dr. Silver: "I have been the treating primary care physician for Elaine Parnagian for greater than ten years. . . . [I] can state unequivocally that Ms. Parnagian is not a malingerer. . . . [A]s a doctor that has been treating this patient directly and has observed her condition over the years, I can unequivocally state that any conclusion suggesting she can return to her workplace, and re-expose herself to her chemical sensitives, without adverse health consequences is not medically sound and against sound medical judgment."); MET-00973-00974 (Dr. LaCava: "I have treated Elaine Parnagian for the symptoms related to chemical sensitivities and food allergies and sensitivities with several visits for more than two years. . . . [A]s her treating doctor, it is my medical advice that she does not return to the workplace as it will pose a risk to her health and well being, and relegate her to the necessary hours or days at home to recover her previous functional capacity."). Although

7

Plaintiff made no claim of disability based on psychiatric limitations, MetLife relied in part on the opinions of Drs. Sugarman and Johnson, both psychiatrists with no proffered expertise in diagnosing or assessing the physical symptoms or non-psychiatric pathology that Plaintiff's treating doctors observed and that Plaintiff herself claims to present. Indeed, both opine on Plaintiff's psychiatric limitations (though none are claimed) rather than her claimed physical limitations. See MET-00831 (Dr. Sugarman: Parnagian's "file information does not support psychiatric functional limitations beyond December 2010 forward"); MET-01016 (Dr. Johnson: Parnagian does not have any "psychiatric functional limitations.").

Further, MetLife relied on the opinion of Dr. Kales, who begins his assessment not with a discussion of Plaintiff's claimed disability, but with incredulity about the very existence of the disorder Plaintiff and her doctors describe. See MET-00866 ("The alleged diagnosis of environmental illness or multiple chemical sensitivities (MCS) is a highly controversial phenomenon whose existence as a toxicologically or otherwise legitimate medical disease has been challenged by a broad spectrum of medical specialty groups. Because the lack of evidence to support toxicity or chemical exposures as being causative, the majority of these groups have advocated a name change for this phenomenon to idiopathic environmental intolerance (IEI). The prestigious groups with position papers that fail to find evidence for chemical exposure causation for IEI, 'environmental illness' or 'chemical sensitivity' include . . . ."). MetLife's own guidelines, however, acknowledge the existence of idiopathic environmental illness ("IEI"), also known as Multiple Chemical Sensitivity Syndrome (MCS) or Environmental Illness (EI). MET-01766. MetLife's reliance, then, on a doctor who appears to actually premise his report on

doubting the existence of a pathology that MetLife itself contemplates assessing under the Plan, is misguided.[3]

Dr. Kales' further notation that there "is also no objective evidence that [Plaintiff] would be more 'exposed' to chemicals at work than at home," MET-00865, also adds an unwarranted criticism, for Plaintiff's claim is a disability claim, not a claim for workers' compensation. As such, the claim does not require that the disability be caused by the workplace and is not undermined in any way if Plaintiff suffers disabling symptoms outside of the workplace.

But at bottom, Plaintiff needed to demonstrate she was "fully disabled" in order to qualify for long term disability benefits under the Plan. Defs.' St. Undisp. Facts [#60] ¶ 20; see Leahy, 315 F.3d at 18 ("We turn now to the merits of the denial of benefits. The Plan's definition of 'fully disabled' controls."). To be "fully disabled," Plaintiff has the burden of showing not only that she was under the care of a doctor (which is undisputed), but that she "cannot perform the essential elements and substantially all of the duties" of her job."[4] MET-01668. And to make such demonstration, she needed to proffer "objective evidence satisfactory to the Claims Administrator," who bears "sole discretion" to determine eligibility. MET-01680.

---

[3] Dr. Mirkin also appears to doubt the legitimacy of Plaintiff's diagnosis, opining that such diagnoses are premised on a "scientifically unsupported theory that some people are more sensitive, hypersensitive or even 'allergic' to chemicals at concentrations well below those scientifically shown to be toxic . . . ." MET-00993.

[4] The text of Raytheon Company's Disability Plan is located on MET-01661-01716. Article II, § 2.11, defines "Fully Disabled": it "means that, because of a sickness or injury which is not covered by an applicable workers' compensation statute, a Participant: (i) cannot perform the essential elements and substantially all of the duties of his or her job with the Employer even with reasonable accommodation; and (ii) is under the care of a Doctor." MetLife begins its denial letter by summarizing this definition: "The Plan requires that in order for you to be eligible to receive Long Term Disability benefits, in addition to satisfying all other Plan provisions, for the first eighteen (18) months, being disabled means that you cannot do the essential elements and substantially all of the duties of your job with reasonable accommodations and you can demonstrate that you are under the regular care and attendance of a Doctor." MET-00954.

The thrust of Plaintiff's argument before this court is that her condition cannot be diagnosed via objective medical criteria, and that MetLife therefore erred in denying her claim based on the absence thereof. Pl.'s Mem. [#64] 6-14. She argues that in denying her benefits for want of objective medical evidence, MetLife eschewed not just the unique physiological nature of MCS and IEI, but also its own Plan's procedures and guidelines which take into account these conditions' symptoms-based and subjective realities. Id. She argues further that the physicians utilized by MetLife relied solely on the non-existence of objective medical evidence to the diminishment of her actual experienced symptomology, and that MetLife in turn failed to "properly address the functional impact of her chronic symptomology in its determination . . ." or "address the impact of [her] ongoing symptoms and limitations . . . ." Id. These combined errors, Plaintiff contends, amounted to a breach by MetLife of its obligation under the Plan to fully and fairly review her claim. Id. The court finds no reversible error.

As to reliance on an absence of objective evidence, the First Circuit has drawn a distinction in these analyses between the error of requiring objective evidence to support the diagnosis of a disease that does not manifest itself in an objectively-verifiable manner (*e.g.* chronic fatigue syndrome or fibromyalgia), and the justified requirement that a claimant's *limitations* be objectively verifiable. See Denmark v. Liberty Assur Co. of Boston, 481 F.3d 16, 37 (1st Cir. 2007), abrogated on different grounds by Denmark v. Liberty Assur Co. of Boston, 566 F.3d 1 (1st Cir. 2009) ("However, this court draws a distinction between requiring objective evidence of the diagnosis, which is impermissible for a condition such as fibromyalgia that does not lend itself to objective verification, and requiring objective evidence that the plaintiff is unable to work, which is allowed."); Boardman v. Prudential Ins. Co. of Am., 337 F.3d 9, 16-17 n.5 (1st Cir. 2003) ("Rather, Prudential wanted objective evidence that these illnesses rendered

her unable to work. While the diagnoses of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis."). In other words, while it is unreasonable to rule out a disease because of the absence of objective clinical findings, the distinct inquiry of whether an impairment renders a claimant disabled under the governing plan may require objective evidence.

Here, MetLife's decisions denying Plaintiff's claim respect this distinction. See MET-00941 (" . . . for the reasons detailed below and based on a thorough review of all of the documentation on file, it is MetLife's determination that the information does not support your inability to perform the duties of your job . . . ."); MET-01763 ("After a full and fair review of all the medical and vocational information on file, the documentation provided does not support the severity of a condition that that would have rendered Elaine Parnagian totally disabled and unable to perform the essential elements of her job . . . ."). And MetLife's conclusions that Plaintiff presents no objective evidence supporting her limitations is based at least in part on the report from Dr. Mirkin, who concludes, after reviewing Plaintiff's reported symptoms and the allergen test and genetic tests Dr. LaCava references in his opinion, that "[f]rom a physical standpoint, there was no objective evidence in the medical documentation provided[] sufficient to prevent the claimant from performing her job duties . . . ."). MET-00996, 01004.[5] In response,

---

[5] Further, it appears the questions put to MetLife's reviewing physicians included questions as to Plaintiff's actual limitations: Dr. Sugarman was explicitly asked by MetLife whether Plaintiff's "medical information support psychiatric functional limitations." MET-00831. Dr. Kales was explicitly asked by MetLife whether the medical records support "the restrictions[] and the symptoms, as set forth by the treating provider(s) and the symptoms and limitations claimed by the claimant." MET-00871. Dr. Mirkin was explicitly asked by MetLife whether any "medical information support functional limitations beyond December 22, 2010," to include functional limitations that have "any reduction in ability to work full time." MET-01000. Dr. Johnson was explicitly asked by MetLife whether "the medical information support psychiatric functional

although she presents the strong opinions of two treating physicians, Plaintiff has not demonstrated objective evidence in the record that runs contrary to this conclusion or, more to the point, that would render MetLife's decision an abuse of discretion or otherwise outside the ambit of merely weighing conflicting evidence. See Vlass v. Raytheon Emps. Disability Tr., 244 F.3d 27, 32 (1st Cir. 2001) (administrator's duty to weigh conflicting evidence); Black & Decker, 538 U.S. at 834 (no special deference owed to treating physicians akin to the Social Security Administration's "treating physician rule"); see also Leahy, 315 F.3d at 16 ("Analyzing disability claims plainly requires expertise. It is, therefore, difficult to fault a plan administrator for seeking expert assistance (indeed, it probably would be easier to fault a plan administrator for not seeking such assistance.")).

Plaintiff's argument that MetLife contradicted its own procedures in deciding her case also misses the mark. Plaintiff's argument is twofold: that the Plan language requiring objective proof of disability is curtailed by the Guidelines found at MET-01765-01767, which provides additional guidance in the context of IEI and notes its subjective nature; and that MetLife failed, as required, to assess the limiting effects of her symptoms. But on review, the court does not find significant distinctions between what the Plan requires and what the Guidelines suggest a claims administrator do when presented with a case like Plaintiff's, and what MetLife actually did in Plaintiff's case: MetLife, per the Guidelines, submitted Plaintiff's file for evaluation to assess how her symptoms affected her functioning, see supra 11 n.5., and those evaluators did in fact document Plaintiff's symptoms as reported.[6] In turn, MetLife's own decision chronicles Plaintiff's treatments and symptoms, but draws an unfavorable assessment of their severity.

---

limitations from December 2010 and beyond." MET-01016. Each physician consulted Plaintiff's records, and answered each question in the negative.

[6] Further, the Plan permits MetLife to resolve the tension between, on one hand, the requirement

12

In sum, MetLife's decision to deny Plaintiff's claim for long-term disability was based on evidence that was "reasonably sufficient to support a conclusion": the court does not find on this record an abuse of discretion or a decision made in a reversibly arbitrary or capricious manner. Although results may be unfortunate in light of Plaintiff's reported subjective symptoms, where a record "is capable of supporting competing inferences as to the extent of the plaintiff's ability to work . . . that clash does not suffice to satisfy the plaintiff's burden." Leahy, 315 F.3d at 18-19.

V. Conclusion

For the foregoing reasons, Defs.' Motion for Judgment on the Record [#58] is ALLOWED and Pl.'s Cross Motion for Judgment on the Record [#63] is DENIED. This case is closed.

IT IS SO ORDERED.

September 29, 2017 /s/ Indira Talwani
United States District Judge

---

that objective evidence support benefits claims, and on the other, the further guidance given for the subjective nature of IEI. MET-01679 (noting discretion to non-discriminatorily "resolve ambiguities, inconsistencies, or omissions conclusively.").